

CERTIFIED COPY
A True Copy
Teste:
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 07-3903

JONATHAN A. CATLIN,

                      *Plaintiff-Appellant*,

        *v.*

CITY OF WHEATON, a municipal corporation of the
State of Illinois, BILL COOLEY, ANDREW UHLIR,
EDWARD FANNING, MATTHEW HALE & MARK FIELD,
employees and agents of the City of Wheaton,

                      *Defendants-Appellees,*

        and

COUNTY OF DUPAGE, a political subdivision of the
State of Illinois, JOHN ZARUBA, Sheriff of DuPage County,
Illinois, DUPAGE COUNTY MAJOR CRIMES TASK FORCE,

                      *Defendants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 2590—**Harry D. Leinenweber**, *Judge*.

ARGUED MAY 11, 2009—DECIDED JULY 21, 2009

Before CUDAHY, POSNER, and KANNE, *Circuit Judges.*

CUDAHY, *Circuit Judge.*   Jonathan Catlin was arrested and briefly detained when members of the Wheaton Police Department mistook him for the ringleader of a local drug operation. Catlin subsequently sued for false arrest and excessive force. The district court granted summary judgment for the defendants on the basis of qualified immunity. We affirm.

## I. BACKGROUND

On August 20, 2003, the DuPage County Sheriff's Narcotics Unit conducted a major operation to arrest numerous members of a drug conspiracy in Wheaton, Illinois. The operation involved over seventy-five officers from neighboring jurisdictions, including the defendants in this case, who are members of the Wheaton Police Department. The DuPage Narcotics Unit assigned the defendants the task of executing an arrest warrant for Robert Ptak, the kingpin of the drug conspiracy. The defendants were told that Ptak's arrest warrant was for Class X felonies—the highest class of felony under Illinois law—that Ptak was armed and dangerous, that he had resisted arrest on several prior occasions and that he had threatened violent resistance if the police attempted to re-arrest him.

At about 12:30 in the afternoon, the defendants were dispatched to the Red Roof Inn in Downers Grove, Illinois, where Ptak was believed to be staying. They were given a photograph and physical description of Ptak, and told

No. 07-3903　　　　　　　　　　　　　　　　　　　　　　3

that he had recently been seen riding a yellow, "crotch rocket" style motorcycle.[1] Upon arriving at the scene, the defendants observed a person matching Ptak's physical description who was operating a yellow sport-motorcycle in the parking lot adjacent to the Red Roof Inn. As it happened, however, this person was not Ptak. Rather, it was the plaintiff, Jonathan Catlin. Further, Catlin was not actually leaving the Red Roof Inn. Instead, he was leaving his workplace, which was located about 100 yards from the Red Roof Inn. Nevertheless, thinking that they had located Ptak, the defendants drove past Catlin in their unmarked S.U.V., Catlin pulled out behind them and the parties drove a short way until they both came to a stop at a traffic light.

For the purposes of this appeal, we credit Catlin's version of what happened next. According to Catlin, while the parties were stopped in traffic, defendants Uhlir and Fanning jumped out of the S.U.V. and ran toward Catlin. Uhlir and Fanning were dressed in plain clothes and did not identify themselves as police officers.[2]

---

[1] "Crotch rocket" is apparently a slang term for a sport-motorcycle. The foot pegs and shifters on this type of motorcycle are placed farther back than usual, causing the rider to lean forward and assume an aerodynamic position. *See* http://en.wikipedia.org/wiki/Sportbike (visited 6/11/09).

[2] Our duty to view the evidence in the light most favorable to Catlin is complicated somewhat by the fact that Catlin's statement of material facts contains admissions that cast doubt on his allegation that the defendants did not identify themselves
(continued...)

4	No. 07-3903

(A third defendant, Hale, was unable to exit from the car with the other two as planned because the child safety locks were activated on the back door.) Uhlir and Fanning approached Catlin from either side, grabbed him and threw him onto the grass by the side of the road. While the defendants were attempting to restrain him, Catlin admits that he began to struggle "really, really hard" and managed to break free. Subsequently, Fanning tackled him and Uhlir held him in place by placing his knee on Catlin's lower back. The defendants told Catlin to "stop struggling," but they still did not identify themselves as police officers. By then, Hale had managed to unlock the back door of the S.U.V. and join the other officers. Hale handcuffed Catlin while Uhlir and Fanning held him down.

Almost immediately, the defendants realized their mistake. While he was being restrained, Catlin protested

---

[2] (...continued)
as police officers. First, Catlin admits that the defendants were wearing their badges around their necks when they approached him. Second, and more significantly, he admits that Officer Hale heard his fellow defendants identify themselves as police officers. (No. 1:04-cv-02590, Doc. No. 43, at 2, 5 (admitting Uhlir ¶¶ 43-44 and Hale ¶ 69).)

While these admissions may well undermine Catlin's claim that the defendants did not identify themselves as police officers prior to arresting him, the defendants have not argued this, and therefore any such argument they might have made is waived. At any rate, as we discuss below, the defendants are entitled to qualified immunity even if they did not identify themselves as police officers before restraining Catlin.

No. 07-3903 5

that the defendants "have the wrong guy." After successfully restraining him, the defendants checked Catlin's identification, confirmed their mistake and released him. Catlin estimates that he was detained for approximately 20 minutes. Although there was some damage to his motorcycle, he was able to drive himself home.

Catlin commenced this Section 1983 action, alleging that the defendants violated his Fourth Amendment rights by unlawfully seizing him and using excessive force in the course of restraining him. The district court granted summary judgment for the defendants, finding that the defendants were entitled to qualified immunity with respect to both Catlin's false arrest claim and his excessive force claims.[3]

## II. DISCUSSION

We review *de novo* the decision granting summary judgment for the defendants on the basis of qualified immunity. *Phelan v. Vill. of Lyons*, 531 F.3d 484, 487 (7th Cir. 2008). Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Viilo v. Eyre*, 547 F.3d 707, 709 (7th Cir. 2008). The

---

[3] The court also granted summary judgment on Catlin's state law claims and on his *Monell* claim against the City of Wheaton. Catlin does not challenge this portion of the district court's judgment on appeal.

purpose of the doctrine is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 815 (2009).

To overcome qualified immunity, a plaintiff must show that (1) the facts make out a violation of the plaintiff's federal rights, and (2) the right at issue was clearly established at the time of the defendant's alleged misconduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Chaklos v. Stevens*, 560 F.3d 705, 711 (7th Cir. 2009). We may address these issues in the order we deem most expedient. *See Pearson*, 129 S.Ct. at 818. Thus, where it is apparent that the alleged right at issue is not clearly established, we may decide the case on these grounds without first deciding if there was an underlying constitutional violation. *Id.*

Catlin argues that the defendants are not entitled to qualified immunity because they did not take reasonable steps to verify his identity prior to the arrest, and because there are triable issues of fact as to whether the force they used in effecting the arrest was reasonable. We are unpersuaded by either of these arguments. However, the second argument presents a closer question.

### A. False Arrest

When police officers mistake a person for someone they seek to arrest, the arrest is constitutional if the officers (1) have probable cause to arrest the person sought, and (2) reasonably believe that the person arrested

No. 07-3903 7

is the person sought. *Hill v. California*, 401 U.S. 797, 802 (1971); *United States v. Marshall*, 79 F.3d 68, 69 (7th Cir. 1996).

In the present case, the arrest warrant gave the officers a basis for arresting Robert Ptak. The only issue, therefore, is whether they were reasonable in thinking that Catlin was Ptak. We think that they were. Catlin physically resembled Ptak,[4] was observed in the precise area where the defendants expected to find Ptak and was driving the same distinctive sort of motorcycle as Ptak.

Catlin's argument that the defendants should have checked his license plates prior to arresting him is unavailing for two reasons. The defendants believed that they were confronting a dangerous felon on a racing motorcycle in an area adjacent to a state highway. The defendants were under no constitutional obligation to dither, especially since additional efforts to verify Catlin's identity could have given him an opportunity to flee. *E.g.*, *Marshall*, 79 F.3d at 69 ("Requiring a higher level of verification or corroboration at this point risked allowing a golden moment to pass—[the suspect] could have fled while more evidence was gathered.").

Further, the defendants are required to show only the *reasonableness* of their belief that the person they arrested

---

[4] Ptak was a 30 year old white male with closely cropped brown hair, standing 6'1" and weighing 208 pounds. Catlin was a 27 year old white male with closely cropped brown hair, standing 6' and weighing about 190 pounds. Further, our review of the photographs contained in the record persuades us that the facial resemblance was strong.

was the person they were seeking; they are not required to show that they knew *with certainty* that the person they arrested was the person they were seeking. Often, there will have been more that an officer could have done to confirm a suspect's identity. This will not render an arrest unconstitutional so long as the officer's actions were reasonable under the circumstances.

### B. Excessive Force

Catlin also argues that the defendants used excessive force when they arrested him. Because the arrest was valid, the defendants were allowed to use some force in the course of effecting the arrest. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("[T]he right to make an arrest . . . carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Our assessment of whether the defendants' use of force in the present case comports with the Fourth Amendment's "reasonableness" requirement requires us to balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.*; *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). Particular factors we consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396; *Abdullahi*, 423 F.3d at 768.

In the present case, Catlin alleges that the defendants confronted him without identifying themselves as police

No. 07-3903                                                     9

officers, forced him off his motorcycle and "tossed him" to the side of the road.[5] He alleges that subsequently—and still without identifying themselves as officers—the defendants tackled him, held him face down by placing a knee in his lower back and told him to "quit resisting" as they handcuffed him.

Most of the defendants' actions on this narrative strike us as reasonable: the defendants thought they were confronting an armed and dangerous felon who had announced his intention to flee or fight rather than be arrested. They were under no constitutional obligation to carry out the arrest in a way that would have given Ptak an opportunity to make good on his earlier threats. In what follows, we analyze what seem to us Catlin's two strongest arguments that the defendants' use of force was excessive: first, he argues that the reasonableness of the force the defendants used to subdue him is inherently a jury question; and second, he suggests that it was unreasonable for the defendants to fail to identify themselves as police officers prior to completing the arrest.

1. **The amount of force the defendants used to restrain Catlin**

Again, the reasonableness of a particular use of force depends on the circumstances of the case. *Graham*, 490

---

[5] The district court disregarded Catlin's allegation that at least one defendant drew his gun in the course of the arrest, finding that this allegation was contradicted by Catlin's deposition testimony. Catlin has not challenged this finding on appeal.

10 No. 07-3903

U.S. at 396. Catlin's principal argument is that when officers use more than a *de minimis* amount of force in carrying out an arrest, the question of whether the use of force was reasonable is for the jury. Catlin relies heavily on our decision in *Abdullahi*, where we said "since the *Graham* reasonableness inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, we have held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." 423 F.3d at 773 (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002) (internal quotation marks omitted)).

Catlin focuses on the conclusion of this remark—namely, that summary judgment should be granted sparingly in excessive force cases—while disregarding the premise on which it was based. The *reason* that summary judgment is often inappropriate in excessive force cases is that the parties typically tell different stories about what happened. Here, by contrast, there are no material factual disputes. According to both parties, Catlin was tackled, at which point Uhlir held him in place by forcibly placing his knee on Catlin's back while Hale handcuffed him. In the light of the fact that Catlin admitted that he "struggled really, really hard" and managed temporarily to break free, these actions were reasonable as a matter of law.

Further, while there are superficial similarities between the facts of the this case and those of *Abdullahi*, the facts and the issues presented by the two cases are different.

No. 07-3903 11

In *Abdullahi*, three officers took the arrestee to the ground, at which point one of the officers testified that he placed his right knee on the arrestee's back and increased the pressure until he stopped struggling. 423 F.3d at 765. When the arrestee was fully subdued, the officers realized that he had stopped breathing. Paramedics were unable to resuscitate him, and he was later declared dead. *Id.* at 766. Four doctors testified that the arrestee suffered from injuries consistent with strangulation, and that his chest had been crushed. *Id.* Based on this record, we reversed the district court's grant of summary judgment for the defendants, holding that,

> [t]he reasonableness of kneeling on a prone individual's back during the arrest turns, at least in part, on how much force is applied. Kneeling with just enough force to prevent an individual from "squirming" or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death.

*Id.* at 771.

Viewed at a high level of generality, *Abdullahi* stands for the rather unsurprising proposition that a knee-to-the-back restraint may or may not be reasonable depending on the circumstances. While this may seem to lend some support to Catlin's excessive force claim, *Abdullahi* is distinguishable from the present case for two reasons. First, in *Abdullahi*, the officers used *deadly* force. Cases involving deadly force will often present more difficult questions concerning the reasonableness of the force

that was used than cases like this one, where the arrestee was able to leave the scene without assistance and apparently required no immediate medical attention. Second, and most significantly, *Abdullahi* presented disputed factual issues concerning the type of force that the defendants used: although the defendants testified that they merely placed a knee on the arrestee's back, the plaintiff introduced medical evidence that the arrestee had been strangled and his chest crushed. Here, by contrast, there is no evidence—direct or circumstantial—that contradicts the defendants' version of events.[6]

In short, in the present case, unlike *Abdullahi*, there are no factual disputes the resolution of which could make it reasonable to conclude that the defendants' use of force was disproportionate given the threat they reasonably believed they faced.

### 2. The defendants' failure to identify themselves as officers

Catlin also argues, somewhat more plausibly, that it was unreasonable for the defendants to fail to identify themselves as police officers at some point during the arrest. Here, it is helpful to distinguish between the defendants'

---

[6] Catlin argues that medical records show that he suffered serious injuries as a result of this incident. But these medical records post-date the incident by two years. Whatever Catlin's 2005 MRI results show, they do not show that the defendants used excessive force when they arrested him in 2003.

No. 07-3903                                                                 13

failure to identify themselves *initially*, and their failure to identify themselves after they had forced Catlin from his motorcycle but before they had fully restrained him.

It seems to us that there was nothing unreasonable about the defendants' initial failure to identify themselves. The defendants believed that Catlin was armed and that there was a high probability that he would fight if he were given the opportunity. Having concluded that they needed to act quickly in order to minimize the risk to themselves and to bystanders, the defendants could have reasonably concluded that they needed to use the element of surprise to their advantage.

The defendants' continuing failure to identify themselves after they forced Catlin from his motorcycle seems to us more problematic. On Catlin's version of events, the defendants told him to "quit resisting" when they had him face-down on the grass, but they did not identify themselves as police officers until after he was handcuffed. Assuming, as we must, the truth of these allegations, the risk the defendants ran in failing to identify themselves is that Catlin would think that he was being attacked by common criminals and that this would make him more likely to resist. Indeed, this may have been what actually happened. Catlin admitted that after he was forced from his motorcycle, he struggled and managed to break free. Had the defendants identified themselves as police officers, it is conceivable that Catlin might haven given up without a fight, thus obviating the need for the defendants' final show of force. At any rate, a reasonable jury might so conclude.

14 No. 07-3903

It seems to us a close question whether the defendants' failure to identify themselves was objectively unreasonable under the circumstances.[7] However, even if we assume that the defendants' failure to identify themselves as officers after wrestling Catlin from his motorcycle was objectively unreasonable, they would still be entitled to qualified immunity unless the putative unlawfulness of their conduct was apparent in the light of pre-existing law. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("Public employees are not required, at their financial peril, to anticipate developments in constitutional law."). Even where a plaintiff can show that an officer's use of force was objectively unreasonable, qualified immunity

---

[7] While we decline to decide whether the defendants' failure to identify themselves as police officers violated Catlin's Fourth Amendment rights, we note that "[p]olice officers who unreasonably create a physically threatening situation in the midst of a Fourth Amendment seizure cannot be immunized for the use of deadly force." *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993). Presumably this is equally true when police officers unreasonably contribute to a situation in which they are forced to use non-deadly force.

On the other hand, we must make allowances for the defendants' split-second judgments. *See Graham*, 490 U.S. at 396-97. Accordingly, our sister circuits have been reluctant to hold that an officer violates the Fourth Amendment where his or her split-second judgments exacerbate the need for force. *See Grazier ex rel. White v. City of Philadelphia*, 328 F.3d 120, 127 (3d Cir. 2003); *Drewitt v. Pratt*, 999 F.2d 774, 780 (4th Cir. 1993); *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir. 1992).

No. 07-3903                                        15

affords the officer an additional layer of protection. *See Saucier*, 533 U.S. at 205. Specifically, while the substantive constitutional standard protects officers' reasonable factual mistakes, qualified immunity protects them from liability where they reasonably misjudge the legal standard. *See* Barbara E. Armacost, *Qualified Immunity: Ignorance Excused*, 51 Vand. L. Rev. 583, 650-51 (1998); Teressa E. Ravenell, *Hammering in Screws: Why the Court Should Look Beyond Summary Judgment When Resolving § 1983 Qualified Immunity Disputes*, 52 Vill. L. Rev. 135, 156 (2007).

In the present case, it is far from clearly established that the Fourth Amendment requires police officers to identify themselves in the course of carrying out an arrest in a public place. To the contrary, while the Supreme Court has held that police officers usually must announce their identity before carrying out an arrest in a private dwelling, *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995), we are aware of no court of appeals decision that has recognized a constitutional obligation on the part of the police to announce their identity when they carry out an arrest in a public place.[8] Further, the district courts that have considered this issue are, if anything, divided. *Compare Johnson v. Grob*, 928 F. Supp. 889, 905 (W.D. Mo. 1996) ("a seizure outside the home may be unreasonable because the officers involved were not identified or

---

[8] Without reaching the question of whether such a constitutional obligation exists, the First Circuit held that this putative obligation would not have been clearly established in 1990. *See St. Hilaire v. City of Laconia*, 71 F.3d 20, 27-28 (1st Cir. 1995).

identifiable as such, and the seized person suffers injuries because of the officers' lack of identification.") *and Newell v. City of Salina*, 276 F. Supp. 2d 1148, 1155 (D. Kan. 2003) (holding that a seizure "without having identified themselves as law enforcement officers, may not be objectively reasonable.") *with Sanchez v. City of New York*, No. 96-C-7254, 2000 WL 987288, at *5 (S.D.N.Y. July 17, 2000) (rejecting the plaintiff's Fourth Amendment claim because it "assumes the uncertain proposition that the reasonableness of a seizure outside the home depends on whether the police officer made an announcement or identification").

If there is a legitimate question as to the existence of the right at issue, then qualified immunity attaches. *Mitchell v. Forsyth*, 472 U.S. 511, 535 n.12 (1985). In the present case, even if the defendants had consulted a casebook prior to formulating their plan, they still would not have had fair notice that they had a constitutional obligation to announce their identity prior to completing the arrest. Thus, they are entitled to qualified immunity.

### III. CONCLUSION

It is conceivable that the defendants' failure to identify themselves as officers after initially restraining Catlin increased the likelihood that he would resist, and thus increased the amount of force they had to use in order to effect his arrest. Nevertheless, it is not clearly established that the defendants have a constitutional duty to identify

themselves as officers after they initially immobilize an arrestee but before they fully restrain him.

AFFIRMED.